**Jerome ROSENBERG, Plaintiff,**

v.

**Peter PREISER, Commissioner, Department of Correctional Services of the State of New York, and Theodore Schubin, Superintendent, Ossining Correctional Facility, Ossining, New York, Defendants.**

**No. 74 Civ. 5151-LFM.**

United States District Court,
S. D. New York..

Jan. 24, 1975.

Jerome Rosenberg, plaintiff pro se.

Louis J. Lefkowitz, Atty. Gen., of N. Y., for defendants; Hillel Hoffman, Asst. Atty. Gen., New York City, of counsel.

OPINION

MacMAHON, District Judge.

This is a civil rights action under 42 U.S.C. § 1983. Plaintiff, pro se, a convicted murderer of two police officers, is presently serving a term of life imprisonment at Clinton Correctional Facility (Clinton).

Simultaneously with the filing of the complaint, plaintiff moved, by order to show cause, for a preliminary injunction mandating his return from Clinton to Ossining Correctional Facility (Ossining). Plaintiff alleges that he had been wrongfully transferred from Ossining to Clinton on March 19, 1974 for punitive reasons, without prior notice and an opportunity to be heard, in violation of his constitutional right to due process.

The prison officials asserted in their answering papers that plaintiff had been transferred not because of any disciplinary problem or punitive animus but solely because of a change in the character of a portion of Ossining from a maximum security facility to a medium security facility unsuitable for life termers, such as plaintiff.

The motion for a preliminary injunction, thus, raised issues of fact which could not be definitively resolved without a plenary evidentiary hearing. Accordingly, in the interest of judicial economy, we ordered that the trial on the merits be advanced and consolidated with the evidentiary hearing on the application for a preliminary injunction, pursuant to Rule 65(a)(2), Fed.R.Civ.P.

There is no dispute that plaintiff was transferred from Ossining to Clinton on March 19, 1974 without prior notice or an opportunity to be heard. Likewise, there is no dispute that the transfer occurred one day after the dismissal by the Honorable John P. Donohoe, a justice of the New York Supreme Court, Westchester County, of an action brought by plaintiff against a Dr. Hill, one of the staff doctors at Ossining, alleging deprivation of plaintiff's right to proper medical treatment.

Much of the testimony offered by plaintiff upon this trial was directed not to the issue of the validity of his transfer but to the bona fides of his action against the prison doctor.[1] More pertinently, plaintiff testified that, while his suit against Dr. Hill was pending, he heard "rumors" that he would be "boated out of Ossining," *i. e.*, transferred, as soon as his action against Dr. Hill was terminated. Plaintiff also testified that defendant Schubin told him he had better get "warm clothes." Thomas W. Revak, a physician formerly on the Ossining staff, testified that a prison guard told him that Superintendent Schubin told the guard that plaintiff was to be transferred because he sued Dr. Hill.

Wholly apart from the hearsay nature of this testimony, we find it of virtually no probative value, even if true, in light of the evidence offered by defendants, which we will now discuss.

Superintendent Schubin testified that during the early summer of 1973, the Department of Correctional Services (department) determined to convert a portion of Ossining from a maximum security facility to a medium security facility with less capacity and necessitating a reduction in the prison population generally, as well as the number of maximum security inmates. The department planned to phase in the change beginning in September 1973, and, therefore, a Classification Committee of the department was assigned to study the future capabilities, work programs and manpower needs of Ossining after conversion. That study, in evidence as defendants' Exhibit "E," shows that numerous work programs were assessed and that in the majority of them the size of the cadres was required to be reduced.

It appears from defendants' Exhibit "F" that selection of those inmates to remain and those to be transferred was made on the basis of objective criteria requiring consideration of such factors as the future programs, resident capacity and security level of Ossining, along with the age, residence, capabilities, personality, custodial needs, security risks and class of sentence of the inmate.

In accordance with the study, the authorized staff of the law library, where plaintiff was assigned, was to be re-

---

1. Thus, plaintiff testified that he was suffering from a serious illness and offered the testimony of Dr. Musileoewitz of the Ossining staff, who was of the opinion that plaintiff did have some undefined neurological disorder requiring the attention of outside experts in that field. Before plaintiff's suit against Dr. Hill, Dr. Musileoewitz had sent plaintiff to two outside neurologists for examination, both of whom confirmed that plaintiff was suffering from some vague neurological disorder which they attempted to treat without success.

While this evidence tends to negate malingering by plaintiff and to show an arguable basis for his suit against Dr. Hill, it does not establish that his transfer to Clinton was arbitrary or motivated by punitive animus.

duced from four to three, and under the established criteria, since the law library would be located in a medium security area, eligibility for that cadre was limited to inmates "within one year of meeting the parole board for release consideration." Such inmates were regarded as less of a security risk than those facing longer terms.

Plaintiff, unlike the other three inmates assigned to the law library, will not be eligible for release on parole until 1983 and, therefore, not only failed to meet the criteria established by the Classification Committee for employment in the law library but also posed a greater security risk than those who were to remain. Plaintiff was thus slated for transfer long before his suit against Dr. Hill, but the department did not actually issue an order transferring him to Clinton until December 14, 1973, two days after plaintiff commenced his suit.

Plaintiff further testified, without contradiction, that numerous privileges enjoyed by him at Ossining were denied to him at Clinton.

In Ossining, he was lodged in a room in an honor cell block, worked in the law library at 65¢ per day, assisted other inmates in legal proceedings in Westchester County, received special medication, watched television, moved about freely, was allowed three telephone calls per week, had liberal correspondence privileges and had meaningful visiting privileges because his close relatives lived in New York City.

In Clinton, however, plaintiff is confined to an ordinary cell, works as a porter at 25¢ per day, is restricted in his movement, receives no special medication, does not "practice law," has only one telephone call per week, his correspondence privileges are curtailed and his visiting privileges are fewer and less meaningful because his relatives are now 300 miles away.

The law in this circuit regarding what process, if any, is due a prisoner before he is transferred from one correctional facility to another is not yet fully developed. Two cases deal with the problem. Newkirk v. Butler, 499 F.2d 1214 (2d Cir.), cert. granted sub nom. Preiser v. Newkirk, 419 U.S. 894, 95 S.Ct. 172, 42 L.Ed.2d 138 (1974); United States ex rel. Haymes v. Montanye, Docket No. 74–1208, 505 F.2d 977 (2d Cir., 1974). Newkirk, the earlier case, is now pending in the Supreme Court.

In Haymes, the later case, plaintiff was summarily transferred from Attica to Clinton two days after prison authorities seized a petition addressed to the district court which he had been circulating among the inmates complaining about the deprivation of legal assistance previously provided by inmate Haymes within the prison. The court, in a comprehensive opinion by Chief Judge Kaufman, recognized that when a prisoner is transferred for reasons extrinsic to his behavior, he may not be entitled to notice and a hearing even though the dislocation may be burdensome, but, noting Newkirk and quoting from Gomes v. Travisono, 490 F.2d 1209, 1215 (1st Cir. 1973), the court observed that "it would be anomolous indeed, 'both from a due process and an equal protection point of view, if the prison authorities could accomplish by transfer a procedure-free punishment which they could not accomplish within their own walls.'"[2] Accepting that rationale, the court held that "the hardship involved in the mere fact of dislocation may be sufficient to render . . . summary transfer —if a trial establishes that it was punitive—a denial of due process."[3]

In the earlier case, Newkirk, supra, the inmates had been transferred from medium security Wallkill to maximum security Clinton shortly after circulating a petition for organization of a prison union. The court, noting that the district court had found that the transfer was a disciplinary measure, held that "[w]here the prisoner suffers substantial loss as a result of the transfer he is

---

2. United States ex rel. Haymes v. Montanye, Docket No. 74–1208, 505 F.2d 977 at 981 (2d Cir., 1974).

3. United States ex rel. Haymes v. Montanye, supra at 981.

**642**

entitled to the basic elements of rudimentary due process, i. e., notice and an opportunity to be heard."[4]

We turn now to a consideration of the evidence here in light of the applicable law.

Beyond the fact that he was transferred two days after the dismissal of his state court action against Dr. Hill, there is no evidence that the transfer here was a punitive, disciplinary or retaliatory measure. On the contrary, the overwhelming weight of the credible evidence establishes that, apparently pursuant to a policy of modernizing and restructuring the prison system of the State of New York, the department decided to change the character of old Sing Sing Prison to a less secure and more permissive correctional facility.

The classification study shows that for justifiable reasons, entirely extrinsic to plaintiff's behavior, in order to accomplish the conversion of Ossining, the transfer of plaintiff had been planned by the department during the summer of 1973, long before the institution of plaintiff's state court action against Dr. Hill on December 12, 1973.

Nor is there the slightest suggestion that the plan, which affected some 750 other prisoners, was a mere subterfuge designed to single out plaintiff for punishment. Surely, so comprehensive a plan, affecting the vital interests of so many, was no secret to the prison officials or inmates at Ossining, and it was only natural that it would spawn speculation and rumors.

That the transfer order was put into effect two days after dismissal of the state court action is of no moment, for it was due not to retaliation but to the fact that execution of the order had been stayed or suspended either by the court or the prison authorities to permit plaintiff to prosecute his civil action against Dr. Hill. The very existence of the planned conversion, coupled with the fact of the stay, in all probability accounts for the "rumors" that plaintiff would be "boated out" as soon as his action against Dr. Hill was terminated.

There is not the slightest indication that the transfer order and stay were confidential, but, even if they were, the information was probably leaked to the prison grapevine. Similarly, even if defendant Schubin told plaintiff to get warm clothing, which Schubin denies, it proves nothing beyond the fact that Schubin had knowledge of the planned conversion and outstanding transfer order.

There is not the slightest suggestion in the evidence that plaintiff violated any rule of Ossining or misbehaved in any way. His transfer was not arbitrary, nor meted out to punish, reprimand, deter or reform him. Indeed, there is no evidence that Schubin had anything whatever to do with the transfer order, planned and issued by the department.

Nor was there any evidence of any personal animus against plaintiff on the part of defendants Schubin or Preiser. On the contrary, plaintiff testified that Schubin had introduced him as a model prisoner to outside groups visiting the prison. At such gatherings, Schubin held plaintiff out as a rehabilitated man who had diligently applied himself in earning a law degree and who was devoting his time helping his fellow inmates with their legal problems.

We conclude, therefore, that plaintiff has failed to establish that he was transferred for punitive reasons or as a disciplinary measure.

While we have no doubt that plaintiff has suffered a burden in the loss of privileges as a result of the transfer, in cases such as this, where a prisoner is transferred for reasons entirely extrinsic to his behavior, the decision of whether to transfer would not be advanced in any way by providing notice and a hearing to the transferee. Although the dislocation may be burden-

4. Newkirk v. Butler, 499 F.2d 1214, 1217 (2d Cir.), cert. granted sub nom. Preiser v. Newkirk, 419 U.S. 894, 95 S.Ct. 172, 42 L. Ed.2d 138 (1974).

some, we think the harm to plaintiff is outweighed by the showing of a justifiable need to reduce the population and the security risk at Ossining by transferring maximum security prisoners in order to accommodate its changed character to a medium security facility.

■ In a prison system as large and complex as that of the State of New York, there can be no doubt that differences exist among the various institutions as to privileges offered prisoners. When a prisoner is transferred for reasons entirely extrinsic to his conduct, it is not for the federal courts to meddle with the internal operations of the department simply because the prisoner is understandably unhappy in his new situation.

The foregoing opinion constitutes this court's findings of fact and conclusions of law, in accordance with Rule 52, Fed. R.Civ.P.

Accordingly, the Clerk of the court is directed to enter judgment in favor of defendants dismissing plaintiff's complaint.

So ordered.